**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RICHARD DEEDS                )<br>                                          )<br>             Plaintiff,            )<br>                                          )<br>      vs.                             )<br>                                          )<br>ROBERT BARATS, *et al*.,      )<br>                                          )<br>             Defendants.        )<br>_____) | 3:03-CV-0453-LRH (VPC)<br><br><u>**REPORT AND RECOMMENDATION**</u><br><u>**OF U.S. MAGISTRATE JUDGE**</u><br><br>March 10, 2008 |

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is plaintiff's motion for summary judgment as to defendant Helling (#343), which defendant Helling opposed (#370). Also before the court is plaintiff's motion for summary judgment as to defendants D'Amico and Thorpe (#346), which defendant D'Amico opposed (#375).[1] Plaintiff did not file replies. Also, before the court is defendants' motion for summary judgment as to plaintiff's medical claims (#349). Defendants additionally filed *in camera* exhibits and errata to exhibits (#s350, 351, 352, 356, 358, and 360). Plaintiff opposed (#368) and, with leave of court, filed a supplemental opposition (#394). Defendants replied (#395).

The court has thoroughly reviewed the record and the motions and recommends that plaintiff's motions for summary judgment as to defendant Helling (#343) and defendant D'Amico (#346) be denied, and defendants' motion for summary judgement as to plaintiff's medical claims (#349) be granted in part and denied in part.

**I. HISTORY & PROCEDURAL BACKGROUND**

Plaintiff Richard T. Deeds ("plaintiff"), a *pro se* prisoner, is currently incarcerated in the

---

[1] The court here addresses only the medical claims against defendant D'Amico. Plaintiff's claims against defendant Thorpe will be addressed in a separate report and recommendation.

1    custody of the Nevada Department of Corrections ("NDOC") at the Northern Nevada

2    Correctional Center ("NNCC") (#250). Plaintiff brings his second amended complaint pursuant

3    to 42 U.S.C. § 1983, alleging violations of his First, Fifth, Eighth, and Fourteenth Amendment

4    rights, and 42 U.S.C. § 12101, *et seq*., the Americans with Disabilities Act ("ADA"). *Id.*

5    Plaintiff names as defendants Robert Bayer, former NDOC Director;[2] Jackie Crawford, former

6    NDOC Director; Theodore D'Amico, NDOC Medical Director; Andrew Fras, former NNCC

7    Physician; Donald Helling, NNCC Warden; Chaplain Kelly, NNCC Chaplain; Keith Kennedy,

8    NNCC Lieutenant; Janet Lamb, NNCC Correctional Nurse; Donald Thorpe, NNCC Correctional

9    Officer; and Robert Barats, NNCC Correctional Officer. *Id.*

10           The parties' motions pertain only to counts three, six, seven and eight.[3] In count three,

11   plaintiff alleges that in July 1998, defendant D'Amico violated his Eighth Amendment rights by

12   discontinuing one of plaintiff's medications, Klonopin, which plaintiff alleges caused him to lose

13   most of his digestive tract. *Id.* In counts six and seven, plaintiff alleges that defendant D'Amico

14   violated his Eighth Amendment and ADA rights by denying plaintiff L-Glutamine and a special

15   medical diet, both of which were allegedly prescribed by a specialist to treat his digestive disease.

16   *Id.* In count eight, plaintiff alleges that defendant Helling violated plaintiff's ADA rights by

17   denying plaintiff a memory typewriter, which was allegedly recommended by the medical

18   division to accommodate plaintiff's disabilities. *Id.*

19           The Court notes that the plaintiff is proceeding *pro se*. "In civil rights cases where the

20   plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff

21   the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th

22   Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

23   ///

24

25           [2] The court dismissed defendant Bayer on April 26, 2007 (#198, #240, #258 and #259).

26           [3] In his second amended complaint, plaintiff did not set out formal "counts" (#250). Rather, plaintiff
     sets out eleven claims in paragraph form. However, instead of numbering the paragraphs sequentially,
27   plaintiff numbers his claims to correspond with numbers he assigned these claims in prior complaints. To
     avoid confusion, the court will refer to plaintiff's claims in sequence, as counts one through eleven,
28   beginning with plaintiff's first paragraph.

## II.  DISCUSSION & ANALYSIS

### A.  Discussion

#### 1. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

#### 2. Deliberate Indifference to Serious Harm

A prison official violates the Eighth Amendment when he acts with "'deliberate

indifference' to a substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a plaintiff's case must satisfy an objective standard – that the deprivation was serious enough to amount to cruel and unusual punishment, and a subjective standard – deliberate indifference. *Id*. at 834; *see also Wilson v. Seiter*, 501 U.S. 294, 297-304 (1991).

The objective standard, a "serious medical need," is met if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Ninth Circuit's examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).

The subjective standard of deliberate indifference requires "'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835, *quoting Whitley v. Albers*, 475 U.S. 312, 319 (1986). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id*. at 836. It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate. *Id*. Mere negligence on the part of prison medical staff is not sufficient to prove deliberate indifference. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Prison officials are deliberately indifference when they "deny, delay, or intentionally interfere with medical treatment" of a prisoner's serious medical need. *Id*. Prison medical staff do not violate the Eighth Amendment simply because their opinion concerning medical treatment conflicts with the opinion of the inmate-patient. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

### 3. Americans with Disabilities Act

Title II of the ADA prohibits a public entity from discriminating against a disabled individual on the basis of a disability. *See* 42 U.S.C. § 12132. To prove a Title II ADA claim, plaintiff must demonstrate that he or she: (1) is an individual with a disability; (2) is otherwise qualified to participate in or receive the benefit of some public entity's services, programs or

4

activities; (3) was either excluded from participation in or denied the benefits of the public entity's services, programs or activities, or was otherwise discriminated against by the entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

**B.  Analysis**

As both parties filed motions for summary judgment, the court considers their evidence and arguments together.

**1. Count Three- Klonopin**

In count three, plaintiff alleges that defendant D'Amico violated his Eighth Amendment rights by creating a prescription drug formulary which excluded an anxiety drug called Klonopin (#250).  Plaintiff alleges that he suffers from Crohn's disease, which is an inflammatory bowel disorder, for which he took Klonopin from 1993 to 1998 (#346).  Plaintiff claims that when defendant D'Amico created the prescription drug formulary in 1998, Klonopin became a "non-formulary" drug, and NDOC physicians could no longer prescribe it.  *Id*.  As such, plaintiff's prescription was discontinued on June 19, 1998.  *Id*.  Plaintiff alleges that he went without any medication to treat his anxiety until July 6, 1998, when he was admitted to the Mental Health Unit ("MHU") at NNCC after suffering Klonopin withdrawal symptoms.  *Id*.  Plaintiff claims that the stress caused by his withdrawal symptoms, as well as the lack of anxiety medication, caused his Crohn's disease to flare in such a way that his intestines became diseased and had to be removed in May 1999.  *Id*.  Plaintiff now only has three feet of intestine.  *Id*.

Defendant D'Amico argues that he had no improper intent in removing Klonopin, a benzodiazipine, from the formulary, and moreover, he was not even aware of plaintiff's mental health condition (#395).  Further, defendant D'Amico contends that plaintiff received sufficient therapeutic alternatives to Klonopin.  *Id*.

Defendants submit a declaration by Dr. Bruce Spero, a Senior Psychiatrist for NDOC (#352, D-MSJ 111-114 (*sealed*)).  Dr. Spero first examined plaintiff in July 1998 in the MHU.  *Id*. at ¶ 7.  He states that plaintiff's mental health history includes personality disorder, manipulative behavior and drug-seeking behavior.  *Id*. at ¶ 6.  At the time Dr. Spero first

5

examined plaintiff, he was taking Ativan, which, like Klonopin, is a benzodiazepine used to treat anxiety disorders. *Id*. at ¶¶ 8-10. During July 1998, plaintiff was also prescribed Vistaril, an anti-anxiety medication, and Risperdal, which is used to treat schizophrenia and bipolar disorder. *Id*. at ¶¶ 11, 14.

Dr. Spero states that in August 1998, plaintiff requested that his Risperdal and Vistaril be discontinued because plaintiff did not think that they were effective. *Id*. at ¶ 16. Dr. Klein, another NDOC psychiatrist, then prescribed Desipramine, an antidepressant. *Id*. On September 16, 1998, plaintiff told Dr. Spero that he would no longer take any psychiatric medications, and asked for Klonopin, which Dr. Spero viewed as manipulative and "benzodiazepine-seeking" because plaintiff knew that Klonopin was no longer on the prescription drug formulary. *Id*. at ¶ 18. Dr. Spero prescribed Valium for plaintiff's anxiety, and referred plaintiff to another physician to assess plaintiff's need for Klonopin to treat his bowel problems. *Id*. In October 1998, plaintiff was admitted and then discharged from the MHU, and Dr. Spero characterized plaintiff's behavior as manipulative and theatrical. *Id*. at ¶ 19. Shortly thereafter, plaintiff reported that he was coping well with the Valium at bedtime. *Id*. at ¶ 21. Over the next several months, Dr. Spero examined plaintiff several times, and each time plaintiff had no complaints of anxiety. *Id*. at ¶¶ 22-23. Plaintiff requested that Dr. Spero discontinue his Valium in February 1999, but Dr. Spero ordered that plaintiff at least continue his bedtime dosage, as needed. *Id*. at ¶ 23. On July 29, 1999, Dr. Spero discontinued plaintiff's Valium because plaintiff was no longer taking it. *Id*. at ¶ 24.

Dr. Spero's assessment is that plaintiff was appropriately given replacement medication after Klonopin was discontinued from the formulary. *Id*. at ¶ 25. It is Dr. Spero's opinion that plaintiff was stable for long periods of time, that he is manipulative and drug-seeking, particularly to narcotics and benzodiazepines, and that he shows no signs of anxiety disorder such that he requires medication. *Id*.

The court carefully reviewed plaintiff's lengthy medical records multiple times, and finds that they accord with Dr. Spero's declaration. The court sets out additional information as follows. On April 17, 1998, plaintiff's physician noted that plaintiff continued to be "narcissistic

1   & entitled; makes play for [increased] klonopin, which I continue to deny as klonopin will go off

2   formulary; we will have to taper him soon, but was prevailed upon to keep him on for another

3   2w" (#352, D-MSJ 86 (*sealed*)).  On May 19, 1998, the physician wrote "will need to taper off

4   klonopin which he protests highly."  *Id*.  Orders were entered that day to begin tapering plaintiff's

5   Klonopin prescription.[4]  *Id*. at D-MSJ 22.

6        Plaintiff mental health records reveal that on July 4, Dr. Gedney prescribed plaintiff

7   Vistaril, an anti-anxiety medication.  *Id*.  Two days later, plaintiff was admitted to the MHU

8   because he was acting "paranoid" and had a "wild eye stare."  *Id*. at D-MSJ 84.  Plaintiff was

9   given Ativan and Thorazine.  *Id*. at D-MSJ 23, 83-84.  A notation in his chart states "I've read

10  back on his progress notes and suspect he may be acting to manipulate for a medication that has

11  been removed from the formulary."  *Id*. at D-MSJ 83.  Plaintiff reported not sleeping for "days,

12  weeks, and months."  *Id*. at D-MSJ 82.  However, by July 7, plaintiff appeared more oriented and

13  less confused.  *Id*.  A July 7 entry in plaintiff's chart states, "miracle cure, pt. shows no sign of

14  mental disorder at this time," and comments that plaintiff was seen laughing and joking with staff.

15  *Id*. at D-MSJ 81.

16       On July 8, medical staff noted that plaintiff attempted to get narcotics prescribed.  *Id*. at

17  D-MSJ 80.  On July 11, plaintiff told the nurse he would not take Risperdal because no one asked

18  him and he had not given his consent.  *Id*. at D-MSJ 75.  Plaintiff again refused on July 12 and

19  the morning of July 13, but then requested Risperdal on the afternoon of July 13, stating, "Those

20  doctors have gone to school for 36 years & know what they're doing."  *Id*. at D-MSJ 74.  Plaintiff

21  _____

22       [4] Defendant D'Amico has identified the physician who discontinued plaintiff's Klonopin as a
     medical resident named Andrew Fras, M.D., who was employed by NDOC in 1998 under the supervision
23   of the Mental Health Director at the time (#368, Exhibit 12-M).  In an earlier response, defendant D'Amico
     incorrectly identified the doctor who discontinued plaintiff's Klonopin as an NDOC psychiatrist named Dr.
24   Michelle Martin (#349, D-MSJ 2).  Plaintiff states that the U.S. Marshals were unable to locate Dr. Fras in
     2007 in order to serve him with plaintiff's second amended complaint.  Plaintiff alleges that defendant
25   D'Amico purposely made the earlier incorrect identification to delay plaintiff's receipt of this information
     in order to thwart plaintiff's attempt to join as a defendant the doctor who discontinued his Klonopin.
26   Plaintiff presents no evidence of such a grand conspiracy, and the court gives it no weight.  Moreover,
     plaintiff's claim is that defendant D'Amico acted with deliberate indifference in removing Klonopin from
27   the formulary, such that plaintiff's physicians could no longer prescribe it.  There is no allegation that Dr.
     Fras himself acted with deliberate indifference.

28

was also prescribed more Vistaril. *Id*. at D-MSJ 22.

On July 15, a psychiatrist examined plaintiff, and found that plaintiff presented no problems or complaints, and was "agreeable" to being discharged from the MHU. *Id*. at D-MSJ 73. On July 17, plaintiff walked and played basketball on the yard, and it was noted that plaintiff did not appear depressed, suffered "no anxiety," and wanted to leave. *Id*. at D-MSJ 72. Plaintiff was discharged from the MHU on July 20. *Id*. at D-MSJ 71. On July 22, plaintiff requested Vistaril and Ativan during an examination. *Id*. It was noted that plaintiff had been on Klonopin for five years and had ceased taking it five weeks prior. *Id*. The doctor did not prescribe Ativan, but did prescribe more Vistaril and Risperdal. *Id*. at D-MSJ 22 and 71.

Plaintiff again requested Ativan during an August 6 appointment, telling the doctor that while the Vistaril was effective in helping him sleep, the Risperdal was ineffective. *Id*. at D-MSJ 70. Plaintiff was referred to Dr. Klein to evaluate whether he needed Ativan therapy. *Id*. On August 11, Dr. Klien noted that plaintiff requested that the Risperdal and the Vistaril be discontinued. *Id*. at D-MSJ 70. Dr. Klein prescribed a new medication, Desipramine, and also prescribed Thorazine, "in case [plaintiff] 'goes off.'" *Id*. On August 30, plaintiff's Desipramine and Thorazine prescriptions were renewed. *Id*. at D-MSJ 27.

On September 16, plaintiff informed Dr. Spero that he would no longer take any psychiatric medications. *Id*. at D-MSJ 69. Plaintiff was again described as manipulative because he asked for Klonopin, even though he knew it was not on the formulary. *Id*. Dr. Spero referred plaintiff to Dr. Hines or Dr. Gedney to treat plaintiff's bowel problems. *Id*. at D-MSJ 27 and 69. Dr. Spero discontinued plaintiff's Desipramine, but prescribed Valium. *Id*.

Plaintiff was admitted to the MHU on October 14 because right after Dr. Hines refused to increase plaintiff's pain medication, medical staff allegedly heard plaintiff threaten to kill himself. *Id*. at D-MSJ 69. Plaintiff denied making such a threat. *Id*. Plaintiff's chart indicates that he was holding his abdomen at pill call but would not respond to the nurse's question about whether he was in pain. *Id*. at D-MSJ 68. Plaintiff was described as "manipulative and theatrical" after he demanded his medication for his bowel disease and then said he did not need it when it was given to him. *Id*. Plaintiff was discharged from the MHU on October 15, and a

nurse noted in his chart that "he is wanting more than is going to be offered to him." *Id*. at D-MSJ 67.  On October 21, plaintiff reported that he was "coping really well," that he was seeing Dr. Gedney for his intestinal problems, and that he was still on Valium.  *Id*. at D-MSJ 66.  Plaintiff had "no current complaints" on November 19.  *Id*.  On February 2, 1999, plaintiff stated that he was ready to stop the Valium; however, it was not completely discontinued until July 29, 1999.  *Id*. at D-MSJ 64- 66.

Plaintiff's non-mental health medical records reveal that as early as March 1998 and continuing at least throughout the fall, plaintiff took a drug called sulfasalazine to treat his bowel disease.  *Id*. at D-MSJ 20-29.  On June 29, 1998, just prior to his admittance to the MHU, Dr. Gedney prescribed plaintiff Levsinex, which is a drug commonly used to treat irritable bowel syndrome.[5]  *Id*. at D-MSJ 22.  On July 9, plaintiff complained of constipation and stated that his "insides are messed up." *Id*. at D-MSJ 77.  On July 11, plaintiff reported having some abdominal pain, and asked to be moved downstairs for treatment of his irritable bowl syndrome.  *Id*. at D-MSJ 75.  On July 12, plaintiff requested Ativan for his anxiety, difficulty swallowing, and "intense feeling across eyes;" however, he did not mention requiring Ativan for abdominal pain.  *Id*. at D-MSJ 74.  On July 14, when Dr. Hines examined plaintiff for complaints of stomach pain, plaintiff requested narcotics, which Dr. Hines denied.  *Id*. at D-MSJ 73.  Plaintiff's chart states, "Pt. does not appear uncomfortable."  *Id*.

Plaintiff was in and out of the prison hospital during October and November 1998 for treatment of his abdominal pain.  *Id*. at D-MSJ 28-36.  On October 9, plaintiff was referred to a gastrointestinal specialist.  *Id*. at D-MSJ 30.  On November 17, he was put on a high fat diet to cause weight gain.  *Id*. at D-MSJ 36-37.  On December 1, Dr. Gedney noted that plaintiff had lost a lot of weight and that he could not tolerate most foods from the culinary, and ordered that plaintiff be allowed to order food from the prison store.  *Id*. at D-MSJ 38, 41.  On December 16, 1998, plaintiff was admitted to Carson Tahoe Hospital, and on December 17, Dr. Gedney noted

---

[5] *See generally*
http://www.webmd.com/drugs/drug-9825-Levsinex+Oral.aspx?drugid=9825&drugname=Levsinex+Oral.

that plaintiff had "severe malabsorption syndrome, severe wt loss," and could suffer "imminent possible death." *Id*. at D-MSJ 41.  Plaintiff returned to the prison on December 18.  *Id*.  On December 29, Dr. Gedney ordered that plaintiff be seen by a surgeon "ASAP," and on December 31, plaintiff was diagnosed with a fistula through his abdomen.  *Id*. at D-MSJ 42-43.  Plaintiff continued to be treated for his digestive issues until May 13, 1999, when plaintiff received surgery to remove part of his intestines.  *Id*. at D-MSJ 59.

Plaintiff argues that the lack of Klonopin caused stress, which in turn caused his fistula and ultimate intestine removal.  In support, plaintiff submits a September 15, 1997 letter from Dr. Gedney which states that plaintiff's "stress levels will always increase problems" related to his bowel disease (#368, Exhibit 3).

The court concludes that there is no evidence that the discontinuation of plaintiff's Klonopin prescription caused plaintiff to suffer complications from his bowel disease.  Between July and September 1998, plaintiff was given a number of different medications in place of Klonopin, including Ativan, Thorazine, Risperdal, Vistaril, Valium, and Desipramine.  Plaintiff claims that none of these medications was effective.  However, plaintiff's medical records are replete with statements by numerous doctors and nurses in both the psychiatric and medical departments, at different times, that plaintiff was seeking drugs that he did not need through manipulation.

Plaintiff also argues that Vistaril is an anti-histamine, not an anti-anxiety drug, which is why it was ineffective.  Yet, Dr. Spero's declaration states that Vistaril used to treat anxiety problems, and plaintiff has presented no evidence to refute this.[6]

Plaintiff also protests that his Ativan was discontinued when he was discharged from the MHU because he was not permitted to receive that medication, a benzodiazepine, unless he was in the infirmary.  While this may be true, plaintiff's medical records indicate that he was stable enough to be discharged, was taking other anxiety medications, and wanted to leave the MHU.

---

[6] Further, the court's research indicates that Vistaril is used to treat both anxiety and allergies.  *See* http://www.webmd.com/drugs/drug-6144-Vistaril+Oral.aspx?drugid=6144&drugname=Vistaril+Oral &pagenumber=4

1   Moreover, plaintiff is in prison, where the environment is tightly controlled, especially with

2   respect to access to narcotics. Both Dr. Hines and Dr. Klein evaluated whether plaintiff required

3   a benzodiazipine to treat his anxiety and bowel disease, and concluded that he did not. Plaintiff's

4   medical records indicate that plaintiff received a great deal of medical care during this time frame,

5   leading the court to conclude that had plaintiff's physicians thought a benzodiazipine was

6   indicated, plaintiff would have received it.

7          Plaintiff argues that because he was not given any medication between June 19, 1998,

8   when his Klonopin was discontinued, and July 6, 1998, when he was admitted to the MHU,

9   defendants acted with deliberate indifference. However, there is no evidence that plaintiff

10  requested anxiety medication during this period of time. Defendants could not have treated

11  plaintiff's withdrawal symptoms unless they knew about them. The records indicate that when

12  plaintiff did report his symptoms, he was immediately treated.[7]

13         The court believes that plaintiff had (and currently has) a serious medical problem

14  associated with his bowel disease. However, plaintiff's records reveal that he had suffered from

15  bowel problems for many years prior to Klonopin being discontinued.[8] The only evidence

16  plaintiff relies upon to prove causation is (1) Dr. Gedney's 1997 letter that stress can cause

17  complications to plaintiff's bowel disease, and (2) the fact that plaintiff suffered some stress in

18  1998. However, Dr. Gedney's letter was not related to the discontinuation of Klonopin and

19  merely experiencing stress does not prove causation. The court grants defendant D'Amico's

20

21  ─────────────────

22         [7] Plaintiff also continuously argues that defendant D'Amico failed to consult medication experts and
    failed to document the process he went through in revising the formulary. This is entirely irrelevant to
23  whether defendant D'Amico acted with deliberate indifference to plaintiff's personal medical situation.
    Moreover, even if this were relevant, this would not constitute deliberate indifference to *plaintiff's* medical
24  needs. The most this would constitute is negligence in revising the formulary without expert advice, which
    is not an Eighth Amendment violation. Plaintiff also protests that defendant D'Amico did not create a
25  procedure whereby physicians could request approval for non-formulary drugs such as Klonopin until April
    1999. This is irrelevant because the evidence demonstrates that plaintiff received sufficient substitute
26  medications in 1998.

27         [8] A gastrointestinal specialist, Dr. Yamamoto, examined plaintiff in 2001 (#352, D-MSJ 108-110
    (*sealed*)). Dr. Yamamoto noted that plaintiff had suffered from bowel disease since 1989, when plaintiff had
28  one foot of his small bowl removed. *Id.* at D-MSJ 108.

1   motion for summary judgment as to count three.[9]

2   **2. Counts Six and Seven- Glutamine and Medical Diet**

3   In count six, plaintiff alleges that defendant D'Amico violated his Eighth Amendment and

4   ADA rights by denying plaintiff a nutritional supplement called Glutamine (#250).  Plaintiff

5   claims that defendant D'Amico twice agreed to supply plaintiff with Glutamine, and twice

6   rescinded his order (#346).  In count seven, plaintiff alleges that defendant D'Amico violated his

7   Eighth Amendment and ADA rights by denying plaintiff the medical diet allegedly prescribed by

8   a specialist (#250).  Plaintiff argues that because he is served a 6000 calorie-per-day diet rather

9   than the 2200 calorie-per-day diet recommended by the gastrointestinal specialist, he suffers up

10  to fifty painful bowel movements each day (#346).

11  On November 6, 2000, an NDOC physician prescribed plaintiff a "triple portion" at every

12  meal to treat his bowel disease (#352, D-MSJ 87 (*sealed*)).  Shortly thereafter on February 8,

13  2001, Dr. Yamamoto, an outside gastrointestinal specialist, examined plaintiff.  *Id*. at D-MSJ

14  108-110.  Dr. Yamamoto noted that plaintiff had suffered from bowel disease since 1989, when

15  he underwent a fistulotomy that resulted in the removal of one foot of his small bowel.  *Id*. at D-

16  MSJ 108.  As set out above, plaintiff developed a fistula in late 1998 and had a larger portion of

17  his small bowl resected, leaving him with approximately three feet of small bowel.  *Id*.  At the

18  time of the exam, plaintiff reported having six to seven stools per day, and as many as twenty

19  stools per day if he ate high fatty foods.  *Id*.  Dr. Yamamoto acknowledged that plaintiff likely

20  suffers from Crohn's disease.  *Id*. at D-MSJ 109.  Dr. Yamamoto set out a treatment plan which

21  included several medications.  *Id*.  He additionally stated:

22          We will institute the addition of Glutamine supplementation at 30
            grams per day in three divided doses.  We will institute a diet of
23          20% protein, 20% fat, and 60% carbohydrates, basically an
            American Diabetic Association diet, and shoot for a caloric intake
24          of 2200 calories per day.  With this therapy, we hope that this will
            increase the absorbative surface of his small bowel, possibly
25          convert his colon into a "hind gut" fermenter with absorption of
            nutrients through his colon.
26

27          [9] Although defendant D'Amico also addresses a potential ADA claim, plaintiff has alleged only an
28  Eighth Amendment claim in count three (#250, p. 4).

1    *Id.* Dr. Yamamoto also recommended B12 shots every three months, and Tylenol with codeine

2    liquid three times daily to try to slow plaintiff's small bowel down. *Id.* Dr. Yamamoto discussed

3    alternative therapies with plaintiff, such as the use of growth hormone and immunosuppressive

4    therapies, and stated the reasons why he did not think these were advisable. *Id.* at D-MAJ 109-

5    110.  On February 13, 2001, Dr. Gedney wrote to defendant D'Amico that the "GI specialist

6    recommended following diet- 60% carbohydrate, 20% protein, 20% fat.  You approved 6,000 cal

7    diet.  It should be structured like this since pt. only has 3 ft of intestines." *Id.* at D-MSJ 88.  On

8    February 15, 2001, Defendant D'Amico responded, "Have the culinary do the best they can on

9    this." *Id.*

10         Defendants also submit information indicating that they consulted an outside dietician,

11   who was given plaintiff's medical records via telephone on May 8, 2001 (#360, D-MSJ 88.2).

12   The dietician, noting plaintiff's height, weight, age, medications, diagnosis of Crohn's disease,

13   and Dr. Yamamoto's recommendations, stated that plaintiff needed between 3080 and 3850

14   calories per day to maintain his body weight. *Id.*  She recommended an NDOC low-fat diet

15   because an NDOC regular diet contained thirty-five percent fat, and the low-fat diet contained

16   closer to the percentages Dr. Yamamoto had recommended. *Id.*  The dietician also recommended

17   two cans of Ensure per day to supplement the calorie requirements because NDOC's regular diet

18   contained only 3000 - 3300 calories per day. *Id.*  The dietician stated that there was "no evidence

19   to support inmate request for 6,000 cal/day at this time." *Id.*

20         Dr. Gedney affirms in her declaration that the dietician reviewed Dr. Yamamoto's report

21   and prescribed the diet that "best suited" plaintiff (#352, D-MSJ 116, ¶ 7 (*sealed*)).  Dr. Gedney

22   states that the 6000 calorie-per-day diet is satisfied by plaintiff's nine meals per day and the

23   $15.00 per week plaintiff receives to supplement his diet through canteen purchases. *Id.*  With

24   respect to plaintiff's diet, Dr. Gedney's opinion is that plaintiff is not nutritionally compromised,

25   that he is maintaining weight and muscle mass, and that he is not in jeopardy of being placed on

26   an intravenous life support system. *Id.* at ¶¶ 9-10.  Dr. Gedney additionally states that she was

27   advised that although Dr. Yamamoto "recommended" Glutamine, he did not recommend it as

28   "medically necessary." *Id.* at ¶ 8.  She notes that Glutamine is not consistently available through

13

1  the NDOC pharmacy, and that it is her "professional opinion that Deeds' health was not

2  compromised due to lack of Glutamine." *Id*.

3        Defendant D'Amico states in an interrogatory response that he has no authority over what

4  food the culinary served plaintiff (#368, Exhibit 7-B).  Defendant D'Amico states in another

5  interrogatory request that plaintiff's request for Glutamine was sent to the pharmacy and that the

6  pharmacy was not able to obtain it through their suppliers (#349, D-MSJ 4).  A caseworker also

7  investigated plaintiff's request for Glutamine, and discovered that defendant D'Amico initially

8  approved plaintiff's request, but later rescinded the approval, apparently because defendant

9  D'Amico decided that plaintiff's caloric intake was more than adequate to satisfy plaintiff's

10  nutritional needs.  *Id*. at D-MSJ 149.  Plaintiff was informed that he could obtain the Glutamine

11  through the canteen; however, plaintiff complained that it was too expensive.  *Id*. at D-MSJ 150-

12  151.

13        Defendants also submit the declaration of Richard Jacobs, the NNCC Store Supervisor.

14  *Id*. at D-MSJ 117-118.  Mr. Jacobs states that according to store records, Glutamine has been

15  available for purchase from the NNCC canteen since July 2002, and will continue to be available

16  for purchase in the future.  *Id*.  Mr. Jacobs attaches a list of sales for this product from 2002-2007.

17  *Id*. at D-MSJ 120-122.  Mr. Jacobs also attaches a purchase record setting out plaintiff's purchase

18  of vitamins and nutritional supplements between 2000 and 2007, which indicates that plaintiff

19  has never purchased Glutamine from the canteen.  *Id*. at D-MSJ 119.[10]

20        Plaintiff submits a 2006 memorandum from Dr. Gedney which notes that plaintiff "needs

21  access to bathroom at least every 20 minutes" (#394, Exhibit 11).[11]

22

23        [10] The court finds it interesting that the canteen has been able to consistently obtain Glutamine since

24  2002, while defendant D'Amico asserts that the pharmacy cannot.

25        [11] As an aside, the court notes that plaintiff submits the same evidence in almost all of his filings,
   much of which is irrelevant, and some of which is potentially damaging to his credibility.  For instance, in

26  an attempt to prove that defendant D'Amico denied him Glutamine, plaintiff submits a January 6, 2003 letter
   from Dr. Gedney to defendant D'Amico (#368, Exhibit 20). However, instead of supporting plaintiff's claim,

27  the letter sets out in detail that Dr. Gedney was afraid of plaintiff and no longer wishes to treat him.  *Id*.  The
   letter additionally states that two other NDOC physicians refused to treat plaintiff.  *Id*.  Dr. Gedney writes

28  that plaintiff wants her to examine him without a correctional officer in the room, which she will not do

14

### a. Eighth Amendment

Defendant D'Amico does not dispute that plaintiff has a "serious medical need" due to his bowel disease, which clearly causes plaintiff chronic pain. *Lopez*, 203 F.3d at 1131. Defendant D'Amico argues that Dr. Yamamoto never stated that the Glutamine was medically necessary (#395). He further contends that because plaintiff's treating physician, Dr. Gedney, states that plaintiff's health has not been compromised by the lack of Glutamine, the failure to provide Glutamine does not pose an excessive risk to plaintiff's health (#349). As to plaintiff's diet, defendant D'Amico argues that with the exception of the number of calories, plaintiff receives the same diet that Dr. Yamamoto prescribed. *Id*. Defendant D'Amico also claims that plaintiff simply disagrees with his decisions. *Id*.

The court concludes that there are genuine issues of material fact as to whether a 6000-calorie-per-day diet and the lack of a nutritional supplement cause plaintiff painful and frequent bowel movements, and whether defendant D'Amico acted with deliberate indifference in disregarding the advice of Dr. Yamamoto and the outside nutritionist. Plaintiff alleges that the more food he receives, the more bowel movements he has each day, which causes him extreme and chronic pain. Dr. Gedney's 2006 memorandum supports the assertion that plaintiff has many bowel movements each day. The court notes that Dr. Yamamoto's intention was to reduce the number of plaintiff's bowel movements each day. Both Dr. Yamamoto and the outside nutritionist recommended diets lower in calorie than defendant D'Amico's 6000 calorie-per-day diet, and with specific percentages of protein, fat, and carbohydrates. Instead of taking these expert recommendations, defendant D'Amico continued to approve a 6000 calorie-per-day diet,

---

because "I do not trust him. Anyone who says he has studied me at length, 'as one might the plague or similarly lethal affliction,' is not someone I want to be with in an exam room on my own." *Id*.

Plaintiff also submits evidence to "prove" that the medical staff does not like him and concocted stories about him. The evidence is an investigator's report which states that plaintiff was found with weapons in the infirmary in May 1999 (#368, Exhibit 24; *see also* #394, Exhibits 17 and 18). The investigator recommends that plaintiff be confined to an isolation cell, never be without two correctional officers when medical personnel are present, and be transferred to Ely State Prison. *Id*. All this evidence does is provide more information to the court that plaintiff appears to be a threatening and difficult inmate. Plaintiff also argues that the investigator has since admitted that she was pressured into writing a false report, but provides no evidence of this.

1   told the culinary to just "do the best" they could, and served this to plaintiff for seven years.

2   While Dr. Gedney's declaration states that plaintiff's 6000 calorie-per-day diet does not leave him

3   "nutritionally compromised" because he has maintained weight and muscle mass, and is not in

4   jeopardy of being placed on an intravenous life support system, it fails to address plaintiff's claim

5   that he suffers from multiple painful bowel movements each day.  Plaintiff need not be close to

6   death to have a successful Eighth Amendment claim.  *See Balla v. Idaho State Bd. of Corrections*,

7   595 F.Supp. 1558, 1574-75 (D. Idaho 1984) (holding that there is no penological justification for

8   depriving inmates with serious medical needs, including one inmate with Crohn's Disease, with

9   specially prescribed diets).

10       Defendant D'Amico claims to have had no supervisory responsibility over what culinary

11   employees were doing.  While that may be true, AR 626 requires that "other special medical diets

12   ... must be approved by the Medical Director" (#392, Exhibit 6b).  Thus, defendant D'Amico was

13   required to approve plaintiff's medical diet before the culinary received it.  Defendant D'Amico's

14   characterization of plaintiff's claim – that plaintiff does not like the way the culinary prepares his

15   diet – is inaccurate.

16       Defendant D'Amico also argues that plaintiff could purchase the Glutamine in the canteen

17   if he so desired.  This is irrelevant to whether defendant D'Amico failure to provide plaintiff with

18   the specific nutritional and dietary requirements recommended by specialists may cause plaintiff

19   to suffer from chronic pain.

20       Because genuine issues of material fact exist, the court denies both parties' motions for

21   summary judgment as to plaintiff's Eighth Amendment claims in counts six and seven.

22                **b. ADA**

23       To prove a Title II ADA claim, plaintiff must demonstrate that he: (1) is an individual

24   with a disability; (2) is otherwise qualified to participate in or receive the benefit of some public

25   entity's services, programs or activities; (3) was either excluded from participation in or denied

26   the benefits of the public entity's services, programs or activities, or was otherwise discriminated

27   against by the entity; and (4) such exclusion, denial of benefits, or discrimination was by reason

28   of the plaintiff's disability.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).  A "disability"

is a physical or mental impairment that substantially limits one or more of the major life activities of an individual. *See* 42 U.S.C. § 12102(2).

Plaintiff clearly has a physical impairment related to his digestive system, which affects his "major life activity" of eating. However, assuming, *arguendo*, that plaintiff was indeed denied the benefit of necessary medical care, plaintiff has still failed to present any evidence that defendant D'Amico denied plaintiff Glutamine and the prescribed diet "based on" or *because of* plaintiff's Crohn's disease. *See Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (plaintiff must prove that "such exclusion, denial of benefits, or discrimination *was by reason of the plaintiff's disability*.") (emphasis provided); *see also* 42 U.S.C. § 12132 ("... no qualified individual with a disability, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity ... ."). As there is no evidence that defendant D'Amico denied plaintiff benefits as a discrimination measure because plaintiff has a bowel disease, the court grants defendant D'Amico's motion for summary judgment as to plaintiff's counts six and seven ADA claims.

### 3. Count Eight- Typewriter

Plaintiff alleges in count eight that defendant Helling violated plaintiff's ADA rights by denying plaintiff a memory typewriter (#250).[12] Plaintiff claims that his many ailments, including short bowel syndrome, the need to access the bathroom every twenty minutes, and poor memory due to his medications, render him "disabled" and leave him incapable of writing without a memory typewriter (#343 and #394). He claims it takes him "days" or "10-15 hours days" to write a "coherent paragraph," and that he does not "have that kind of time" (#394). Plaintiff also claims he has written "at least" two books that he is unable to prepare for others to read due to lack of a suitable typewriter. *Id*.

In a February 3, 2003 memorandum, Shayne Weir, Ph.D., a psychologist who examined plaintiff, stated that he "quickly determined that inmate Deeds does not have a formal memory

---

[12] Plaintiff makes a number of other claims in his motion for summary judgment, including alleging First Amendment, equal protection, substantive due process and liberty interest violations (#343). The court disregards these allegations and claims because they are not contained in plaintiff's complaint.

17

1   problem" (#352, D-MSJ 143 (*sealed*)).  Dr. Weir found that plaintiff did have problems with

2   concentration and distractibility which could be attributed to the pain from his bowel disease or

3   to the medications he is taking.  *Id*.  However, Dr. Weir noted that plaintiff "is not cognitively

4   impaired, i.e., there does not seem to be an underlying organicity."  *Id*.  Dr. Weir diagnosed

5   plaintiff as suffering from personality disorder with paranoid, antisocial, and narcissistic features.

6   *Id*.  Dr. Weir recommended that the prison allow plaintiff to purchase the memory typewriter

7   because writing would be "good therapy."  *Id*.  On February 10, 2003, after reading Dr. Weir's

8   memorandum, defendant Helling denied plaintiff's request to purchase a memory typewriter,

9   stating that plaintiff could purchase an approved typewriter from the canteen (#349, D-MSJ 144).

10      Dr. Gedney states in her declaration that plaintiff's narcotic pain medications are intended

11   to be balanced in amounts such that they control his pain without impairing his ability to function

12   (#352, D-MSJ 115, ¶ 6 (*sealed*)).  Defendant Helling also submits a declaration, in which he notes

13   that the memory typewriter that plaintiff wanted to purchase was not approved for purchase, use

14   or possession by NNCC inmates and was not available through the inmate store (#349, D-MSJ

15   123-126, ¶ 6; *see also* D-MSJ 152).  Further, defendant Helling notes that due to security issues,

16   AR 711 expressly prohibited memory typewriters because inmates would have to order the

17   typewriter and supplies from unapproved vendors, and because correctional staff would have

18   difficulty searching disks and the typewriter for contraband (#349, D-MSJ 123-126, ¶ 8).  To

19   allow plaintiff an exception would also cause discord among the inmates.  *Id*.  Defendant Helling

20   states that it was his opinion after talking to medical personnel that plaintiff did not have an actual

21   medical need for a memory typewriter.[13]  *Id*. at ¶ 9.

22      Finally, in 2007, NDOC prohibited all typewriters in inmate cells and all areas to which

23

24   _____

   [13] Defendant Helling also notes that a correctional officer discovered in 2006 that plaintiff was participating in improper behavior by creating betting slips with his regular typewriter (#349, D-MSJ 123-126, ¶¶ 10, 12).  Plaintiff received a notice of charges and his typewriter was confiscated.  *Id*.  Plaintiff

25   protests that the notice of charges for the betting slips was false, and submits copies of betting slips in an attempt to prove that betting is common at NNCC, and that the correctional officer who wrote the notice of

26   charges was retaliating against plaintiff (#368, Exhibits 34-36).  First, all this evidence proves is that plaintiff has betting slips in his possession.  Moreover, whether or not betting is common in prison, or whether or not

27   plaintiff was caught making betting slips, is completely irrelevant to whether defendant Helling violated

28   plaintiff's ADA rights by denying his request for a memory typewriter.

1   inmates have general access after an inmate was killed by another inmate at Ely State Prison by

2   using a weapon fashioned out of a typewriter part. *Id*. at ¶¶ 13-21.

3          To prove an ADA claim, plaintiff must first demonstrate that he has a "disability" as

4   defined by the ADA. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).  A "disability" is

5   (1) a physical or mental impairment that substantially limits one or more of the major life

6   activities of an individual; (2) a record of such an impairment; or (3) being regarded as having

7   such an impairment. *See* 42 U.S.C. § 12102(2); *see also* 28 CFR § 35.104.  The phrase "physical

8   or mental impairment" means "Any mental or psychological disorder such as mental retardation,

9   organic brain syndrome, emotional or mental illness, and specific learning disabilities."  *See* 28

10  CFR § 35.104.  The phrase "major life activities" means functions such as "caring for one's self,

11  performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

12         The court concludes that plaintiff has presented no evidence to create a genuine issue of

13  material fact that he suffers from an ADA-defined "disability" such that he has a medical need

14  for a memory typewriter.  While it is true that plaintiff's bowel disease is a physical impairment

15  that affects his major life activity of eating, this is not related to his ability to write.  Aside from

16  his own assertions, plaintiff has submitted no evidence that he has a mental impairment that

17  substantially limits his major life activity of writing or learning.  However, even if this court takes

18  his assertion as true, the evidence still reveals that NDOC did not deny plaintiff a benefit which

19  was available to everyone else – memory typewriters were prohibited to all NDOC inmates in the

20  1990s for security reasons.  Finally, the evidence demonstrates that defendant Helling did not

21  deny plaintiff's request *because* of plaintiff's alleged disability.  *See Thompson*, 295 F.3d at 895.

22         Dr. Weir's recommendation was just that – a recommendation that granting plaintiff's

23  request might benefit his mental health.  Although plaintiff claims that he is not able to form

24  coherent sentences, this court is familiar with plaintiff.  His many motions and oppositions reveal

25  that plaintiff is well-written, has a large vocabulary, and forms sentences well.  The court

26  observes that plaintiff's request appears related to his desire to more easily write a book.  Plaintiff

27  has identified no constitutional or statutory right to write a book on a typewriter while in prison.

28

19

The court grants defendants' motion for summary judgment as to count eight.[14]

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that:

1.   There is no evidence before the court to indicate that defendant D'Amico's prescription drug formulary removing Klonopin, and the subsequent discontinuation of plaintiff's Klonopin prescription, caused plaintiff's bowel disease to flare up in such a way to cause the removal of a portion of plaintiff's intestines;

2.   Genuine issues of material fact exist as to whether defendant D'Amico acted with deliberate indifference in failing to provide or to assure that plaintiff received Glutamine and the specific medical diet recommended by a gastrointestinal specialist and a nutritionist to treat plaintiff's Crohn's disease. Further, there are issues of fact as to whether this failure causes plaintiff to suffer from frequent, chronic and painful bowel movements;

3.   There is no evidence before the court to indicate that defendant D'Amico denied plaintiff Glutamine and a special diet due to discrimination related to or based on plaintiff's Crohn's disease; thus, plaintiff's ADA claim fails; and

4.   There is no evidence before the court to indicate that plaintiff has a memory "disability" as defined by the ADA such that plaintiff requires a memory typewriter.  Further, the evidence indicates that defendant Helling denied plaintiff's request for a memory typewriter based on security reasons, not because of or based on plaintiff's alleged memory disability.

As such, the court recommends that defendants' motion for summary judgment as to plaintiff's medical claims (#349) be **GRANTED** as to counts three and eight, and **DENIED** as to counts six and seven.  The court further recommends that plaintiff's motion for summary judgment as to defendant Helling (#343) and plaintiff's motion for summary judgment as to defendant D'Amico (#346) be **DENIED**.  Docket number 346 is denied only as to defendant D'Amico.  The court will address the remainder of plaintiff's motion as to defendant Thorpe in a separate report and recommendation.

The parties are advised:

1.   Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and

---

[14] Regardless of the above reasons, the typewriter issue is likely moot as the NDOC has since prohibited all types of typewriters, not just memory typewriters, in inmate cells for security reasons.

Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment as to plaintiff's medical claims (#349) be **GRANTED** as to counts three and eight, and **DENIED** as to counts six and seven. The court further recommends that plaintiff's motion for summary judgment as to defendant Helling (#343) and plaintiff's motion for summary judgment as to defendant D'Amico (#346) be **DENIED**. Docket number 346 is denied only as to defendant D'Amico. The court will address the remainder of plaintiff's motion as to defendant Thorpe in a separate report and recommendation.

**DATED:** March 10, 2008.

_Valerie P. Cooke_

_____
**UNITED STATES MAGISTRATE JUDGE**

21